*An order denying petitioners' motions for reconsideration and to vacate will be issued.*

GEORGE S. NALLE, III, AND CAROLE NALLE, PETITIONERS
*v.* COMMISSIONER OF INTERNAL REVENUE,
RESPONDENT

CHARLES A. BETTS AND SYLVIA I. BETTS, PETITIONERS
*v.* COMMISSIONER OF INTERNAL REVENUE,
RESPONDENT

Docket No. 22026–89, 22047–89.[1] Filed August 5, 1992.

*Charles L. Eppright,* for petitioners.
*William R. Leighton,* for respondent.

HAMBLEN, *Chief Judge:* Respondent determined deficiencies in the Federal income tax liability of George S. Nalle, III, and Carole Nalle (petitioners) as follows:

| Year | Deficiency |
| --- | --- |
| 1980 | $6,163.32 |
| 1983 | 2,638.75 |
| 1984 | 14,012.54 |
| 1985 | 260,804.61 |

---

[1]These cases were consolidated for trial, briefing, and opinion by order of this Court dated Nov. 29, 1991.

Respondent determined deficiencies in the Federal income tax liability of Charles A. Betts and Sylvia I. Betts (petitioners) as follows:

| Year | Deficiency |
|------|-----------|
| 1980 | $14,322 |
| 1983 | 21,184 |

The sole issue for decision is whether section 1.48-12(b)(5), Income Tax Regs., is valid.[2] Section 1.48-12(b)(5), Income Tax Regs., generally provides that the investment tax credit for rehabilitation expenditures is not available where the building or structure is relocated prior to its rehabilitation. (Unless otherwise indicated, section references are to the Internal Revenue Code as in effect for the years in issue.)

### FINDINGS OF FACT

Some of the facts have been stipulated. The stipulation of facts and attached exhibits are incorporated herein by this reference. All of the petitioners were residing in Austin, Texas, at the time of the filing of their petitions.

George S. Nalle, III, was a partner in a joint venture known as Heritage Square Joint Venture (Heritage). In 1982, Heritage purchased two buildings, the Julia Harris House and the Kluge House. Heritage had both houses transported from their original locations in Austin, Texas, to an historic office subdivision (Heritage Square) located in Rollingwood, Texas (a suburb of Austin), where they were rehabilitated. The Julia Harris House was later sold to petitioners Charles and Sylvia Betts.

In 1983 and 1984, Nalle, acting in his individual capacity, purchased six buildings: The Bohls House, the Dimmitt House, the Anderson House, the Johnson House, the Mabry House, and the Commissioner's House. As before, these buildings were transported to Heritage Square where they were rehabilitated. The Dimmitt House, the Mabry House, and the Commissioner's House were originally located in Austin, Texas. The Bohls House, the Anderson House, and the Johnson House were originally located in Taylor, Texas,

---

[2] While respondent's deficiency determination against petitioners George and Carole Nalle is based on several adjustments, petitioners assign error only with respect to respondent's determination disallowing investment tax credits claimed pursuant to sec. 48.

New Sweden, Texas, and Circleville, Texas, respectively. All of the buildings in question were over 40 years old on the date rehabilitation work started.

Heritage did not claim an investment tax credit for the rehabilitation expenses incurred with respect to the Julia Harris House. Heritage elected to pass any and all investment tax credit attributable to the Julia Harris House on to the purchasers, petitioners Charles and Sylvia Betts. In this regard, the Bettses reported an investment tax credit for rehabilitation expenditures in the amount of $35,934 on their joint 1983 Federal income tax return. Of that amount, $14,322 was carried back to reduce their income tax for the 1980 taxable year.

Petitioners George and Carole Nalle reported investment tax credits for rehabilitation expenditures as follows:

| Year | Amount |
| --- | --- |
| 1983 | $14,078 |
| 1984 | 120,661 |
| 1985 | 274,200 |
| 1986 | 94,269 |

As of June 28, 1985 (the date of publication of section 1.48-12, Proposed Income Tax Regs., 50 Fed. Reg. 26794 (June 28, 1985)): (1) Heritage had rehabilitated the Julia Harris House and sold it to Charles and Sylvia Betts; (2) Heritage had completed the rehabilitation of the Kluge House; and (3) Nalle had incurred a substantial portion of the rehabilitation expenditures attributable to each of the six houses he purchased in his individual capacity.

OPINION

Respondent disallowed the investment tax credits claimed by petitioners on the ground that none of the rehabilitated buildings satisfies the definition of a "qualified rehabilitated building" as set forth in section 48(g)(1)(A) and section 1.48-12(b)(5), Income Tax Regs. The operative provision is section 48(g)(1)(A)(iii) which requires that 75 percent or more of the existing external walls must be "retained in place" as external walls in the rehabilitation process. Section 1.48-12(b)(5), Income Tax Regs., provides in pertinent part:

*Location at which the rehabilitation occurs.* [A] building, other than a certified historic structure, is not a qualified rehabilitated building unless it has been located where it is rehabilitated for the * * * forty-year period immediately preceding the date physical work on the rehabilitation began in the case of a "40-year building." * * *

It is respondent's position that, although petitioners "retained" 75 percent of the existing exterior walls in the rehabilitation process, the walls were not "retained in place" in that all of the buildings were moved from their original locations prior to being rehabilitated. In particular, respondent asserts that:

The phrase "in place" must be a limitation on the location of the rehabilitated building. "Retained" and "retained in place" must have different meanings. * * * [E]ither the words "in place" provide a restriction on location, or they are superfluous. * * *

Petitioners counter that each of the rehabilitated buildings satisfies the definition of a "qualified rehabilitated building" as set forth in section 48(g)(1)(A). Petitioners maintain that the phrase "retained in place" merely requires that 75 percent of the existing external walls be retained as external walls in the rehabilitation process, and nothing more. Petitioners further contend that section 1.48-12(b)(5), Income Tax Regs., is invalid on the ground that there is no support in the statute for respondent's imposition of a restriction on the relocation of qualified rehabilitated buildings.

We note at the outset that the Secretary does not enjoy a specific grant of authority to promulgate regulations under section 48. Accordingly, the regulation in question is an interpretative regulation promulgated by the Secretary pursuant to the general grant of authority provided in section 7805(a). Interpretative regulations, although entitled to respect, are entitled to less judicial deference than that given to legislative regulations promulgated pursuant to a specific grant of authority. See *United States v. Vogel Fertilizer Co.,* 455 U.S. 16, 24 (1982); *Phillips Petroleum v. Commissioner,* 97 T.C. 30, 34 (1991).

In *Durbin Paper Stock Co. v. Commissioner,* 80 T.C. 252, 256-257 (1983), we established the standards for examining the validity of regulations:

The * * * [Secretary] has broad authority to promulgate all needful regulations. Sec. 7805(a); *United States v. Correll,* 389 U.S. 299, 306-307

(1967). It is well settled that Treasury regulations "must be sustained unless unreasonable and plainly inconsistent with the revenue statutes." *Commissioner v. South Texas Lumber Co.,* 333 U.S. 496, 501 (1948); accord *Commissioner v. Portland Cement Co. of Utah,* 450 U.S. 156, 169 (1981). Because they constitute contemporaneous constructions by those charged with administration of these statutes, they "should not be overruled except for weighty reasons." *Bingler v. Johnson,* 394 U.S. 741, 750 (1969); *Commissioner v. South Texas Lumber Co., supra* at 501.

It is equally clear, however, that, although regulations are entitled to considerable weight, "* * * [the Secretary] may not usurp the authority of Congress by adding restrictions to a statute which are not there." *Estate of Boeshore v. Commissioner,* 78 T.C. 523, 527 (1982). See *United States v. Marett,* 325 F.2d 28, 30 (5th Cir. 1963); *Coady v. Commissioner,* 33 T.C. 771, 779 (1960), affd. 289 F.2d 490 (6th Cir. 1961). A regulation is not a reasonable statutory interpretation unless it harmonizes with the plain language of the statute, its origins, and its purpose. *United States v. Vogel Fertilizer Co.,* 455 U.S. 16 (1982); *National Muffler Dealers Association v. United States,* 440 U.S. 472, 477 (1979).

Consistent with the foregoing, we examine the historical development of section 48(g) and determine whether the regulation in question implements the congressional mandate in a reasonable manner. *Jackson Family Foundation v. Commissioner,* 97 T.C. 534, 538 (1991).

Prior to 1978, the Internal Revenue Code provided few incentives for the rehabilitation of older buildings. In this regard, the only provisions of any consequence were: (1) Section 191, which allowed certain expenditures incurred in the rehabilitation of certified historic structures to be amortized over a 60-month period;[3] and (2) section 167(o), which allowed accelerated depreciation where rehabilitation expenditures exceeded certain thresholds. At the same time, demolition of historic structures was discouraged through sections 167(n) and 280B. The former provided that the depreciation of a new building erected on a site previously occupied by a certified historic structure would be limited to the straight-line method, while the latter precluded a deduction for the expense of demolishing a certified historic structure.[4]

---

[3] Prior to its repeal in 1981, sec. 191(d)(4) defined the term "certified historic structure" as a depreciable building or structure listed in the National Register of Historic Places or property located in an historic district and certified by the Secretary of the Interior as being of historic significance.

[4] Secs. 191, 167(n) and (o), and 280B were added to the law by the Tax Reform Act of 1976, Pub. L. 94-455, sec. 2124, 90 Stat. 1520, 1916.

In 1978, Congress resolved to further promote the rehabilitation of older buildings by providing an investment tax credit for qualifying rehabilitation expenditures. Faced with concerns respecting the declining usefulness of existing, older buildings throughout the country, primarily in central cities and older neighborhoods of all communities, the House Ways and Means Committee explained:

> The committee believes that it is appropriate now to extend the initial policy objective of the investment credit to enable business to rehabilitate and modernize existing structures. *This change in the investment credit should promote greater stability in the economic vitality of areas that have been developing into decaying areas.* [H. Rept. 95-1445, at 86 (1978), 1978-3 C.B. (Vol. 1) 187, 260; emphasis added.]

To achieve its aims, Congress enacted new section 48(a)(1)(E) which provided that the portion of the basis of a qualified rehabilitated building attributable to qualified rehabilitation expenditures would be treated as "section 38" property. Revenue Act of 1978, Pub. L. 95-600, sec. 315, 92 Stat. 2763, 2828. (At the time, the amount of the credit for investment in section 38 property was limited to 10 percent under section 46(a)(2)).

The term "qualified rehabilitated building" was defined in section 48(g)(1), which provided in pertinent part:

> (A) IN GENERAL.—The term "qualified rehabilitated building" means any building (and its structural components)—
>> (i) which has been rehabilitated,
>> (ii) which was placed in service before the beginning of the rehabilitation, and
>> (iii) 75 percent or more of the existing external walls of which are *retained in place* as external walls in the rehabilitation process. [Emphasis added.]

(The requirement set forth in section 48(g)(1)(A)(iii) will be referred to hereinafter as the external wall test.)

Under section 48(g)(1)(B), the rehabilitated building was required to be at least 20 years old prior to its rehabilitation. In contrast, section 48(g)(2)(B)(iv) provided that any expenditures attributable to the rehabilitation of a certified historic structure would not qualify for the credit unless the rehabilitation constituted a certified rehabilitation under section 191(d)(4).

Three years later, section 48 was revised under the Economic Recovery Tax Act of 1981 (ERTA), Pub. L. 97-34, sec. 212(a) and (b), 95 Stat. 172, 235-236, which replaced the 10-percent credit with a three-tier credit system. Effective as to expenditures incurred after December 31, 1981, section 46(a)(2) was amended to provide for an increase in the amount of the credit for rehabilitation expenditures to 15, 20, and 25 percent of the qualified rehabilitation expenditures incurred on 30-year buildings, 40-year buildings, and certified historic structures, respectively. In conjunction with these changes, Congress repealed sections 191 and 167(n) and (o). ERTA sec. 212(d), 95 Stat. 239.

ERTA also included an amendment of section 48(g)(1)(B) to provide that a qualified rehabilitated building, other than a certified historic structure, was required to be at least 30-years old. Notably, however, the basic definition of a qualified rehabilitated building as set forth in section 48(g)(1)(A) (and particularly the external wall test) remained unchanged.

The reasons for increasing the rehabilitation credit were explained by the Senate Finance Committee as follows:

*Reasons for Change*

The tax incentives for capital formation provided in other sections of this bill might have the unintended and undesirable effect of reducing the relative attractiveness of the existing incentives to rehabilitate and modernize older business structures. *Investments in new structures and new locations, however, do not necessarily promote economic recovery if they are at the expense of older structures, neighborhoods, and regions.* A new structure with new equipment may add little to capital formation or productivity if it simply replaces an existing plant in an older structure in which the new equipment could have been installed. Furthermore, the relocation of business can result in substantial hardship for individuals and communities. * * *

*The increased credit for rehabilitation expenditures is intended to help revitalize the economic prospects of older locations and prevent the decay and deterioration characteristics of distressed economic-areas.*

[S. Rept. 97-144, at 72 (1981), 1981-2 C.B. 412, 437; emphasis added.]

The Deficit Reduction Act of 1984, Pub. L. 98-369, sec. 1043, 98 Stat. 494, 1044, modified the definition of a qualified rehabilitated building under section 48(g). Specifically, the legislation added new section 48(g)(1)(E), effective as to expenditures incurred after December 31, 1983, to provide an

alternative to the external wall test under section 48(g)(1)(A)(iii). Section 48(g)(1)(E) provided that the external wall test would be deemed satisfied if in the rehabilitation process:

(i) 50 percent or more of the existing external walls of the building are retained in place as external walls,

(ii) 75 percent or more of the existing external walls of such building are retained in place as internal or external walls, and

(iii) 75 percent or more of the existing internal structural framework of such building is retained in place.

The regulation in question, section 1.48-12, Income Tax Regs., was published in proposed form in 50 Fed. Reg. 26797 (June 28, 1985). The notice of proposed rulemaking stated that the amendments would be effective generally for rehabilitation expenditures incurred after December 31, 1981. Section 1.48-12(b)(3)(iv), Proposed Income Tax Regs., *supra* at 26800, provided in pertinent part:

*Retained in place.* An existing external wall is retained in place if the supporting elements of the wall are retained in place. An existing external wall is not retained in place if the supporting elements of the wall are replaced by new supporting elements. * * * An external wall is retained in place if the wall is disassembled and reassembled, provided the same supporting elements are used when the wall is reassembled and the configuration of the external walls of the building after the rehabilitation is the same as it was before the rehabilitation process commenced. * * *

Section 1.48-12(b)(5), Proposed Income Tax Regs., *supra* at 26801, provided in pertinent part:

*Location at which the rehabilitation occurs.* A building, other than a certified historic structure * * * is not a qualified rehabilitated building unless it has been located where it is being rehabilitated for the thirty-year period immediately preceding the date physical work on the rehabilitation began in the case of a "30-year building" or the forty-year period immediately preceding the date physical work on the rehabilitation began in the case of a "40-year building." * * *

Following the publication of the proposed regulations, the definition of a qualified rehabilitated building was again amended under the Tax Reform Act of 1986, Pub. L. 99-514, sec. 251(a) and (b), 100 Stat. 2085, 2183. In short, the 1986 Act: (1) Reduced the amount of the investment credit to 10 percent for buildings first placed in service before 1936 and to 20 percent for certified historic structures; and (2) adopted

as the external wall test under section 48(g)(1)(A)(iii) the alternative test first adopted as section 48(g)(1)(E) under the Deficit Reduction Act of 1984, *supra.*[5]

Section 1.48-12, Income Tax Regs., was adopted as a final regulation on October 7, 1988. See T.D. 8233, 1988-2 C.B. 11. (Although additional language was added to section 1.48-12(b)(5), Income Tax Regs., to reflect changes provided in the Tax Reform Act of 1986, the language of the provision as originally proposed (quoted *supra*) remained intact.)

With the foregoing as background, we return to the question of whether section 1.48-12(b)(5), Income Tax Regs., carries out the congressional mandate underlying section 48(g). We conclude that the regulation harmonizes with congressional intent.

The legislative history of section 48 reveals that it is not, as petitioners contend, solely a device to promote the rehabilitation of older buildings. From its inception, the tax credit for rehabilitation expenditures was intended to provide an economic stimulus for those areas susceptible to economic decline and abandonment, particularly the "central cities and older neighborhoods of all communities." See H. Rept. 95-1445, at 86 (1978), 1978-3 C.B. (Vol. 1) 187, 260. Congress' intentions in this regard were articulated in unequivocal terms when section 48 was amended in 1981. Specifically, the Senate Finance Committee stated that the enhanced rehabilitation tax credit under ERTA was "intended to help revitalize the economic prospects of older locations." See S. Rept. 97-144, at 72 (1981), 1981-2 C.B. 412, 437. Undoubtedly, Congress envisioned that the rehabilitation tax credit would provide a financial incentive for existing businesses to improve their facilities and plants in older locations rather than to abandon those facilities for another locale. Similarly, the credit would provide an incentive for new businesses to locate in such areas.

In light of these specific policies and concerns, it is reasonable to conclude that the investment tax credit for rehabilitation expenditures was not intended to benefit those who relocate a building prior to its rehabilitation. As we see it, the removal of a building from a declining area of an inner

---

[5] Sec. 48 ultimately was redesignated as sec. 47 under the Omnibus Budget Reconciliation Act of 1990, Pub. L. 101-508, sec. 11813, 104 Stat. 1388-536.

city or community will provide little or no economic benefit to that area. On this basis, we hold that section 1.48-12(b)(5), Income Tax Regs., constitutes a reasonable interpretation of the definition of a qualified rehabilitated building set forth in section 48(g)(1)(A).

Petitioners nonetheless contend that at the time Nalle and Heritage were in the process of relocating the buildings in question to Heritage Square, the only guidance available included section 1.48-11, Proposed Income Tax Regs., 45 Fed. Reg. 71368 (Oct. 28, 1980), and section 1.191-2(e)(6), Income Tax Regs. (T.D. 7770, 1980-2 C.B. 73, 78). Petitioners emphasize that the former provision contained no restriction precluding the relocation of a qualified rehabilitated building and that the latter provided that the expenses of relocating a certified historic structure were permitted to be included in the rehabilitation expenses subject to amortization over a 60-month period. With these regulations in mind, petitioners contend that "Since Congress failed to include such a prohibition on relocation in the statute, it is apparent that Congress intended to allow relocation of 30-year buildings, 40-year buildings, and certified historic structures." We disagree.

The lack of a restriction precluding relocation in section 1.48-11, Proposed Income Tax Regs., *supra,* does not, in our view, provide reasonable authority for the proposition that relocation is permitted. Confronted with recently enacted legislation, and in light of the magnitude of their rehabilitation project, petitioners should have examined the statute and its background in greater detail prior to proceeding with the purchase of the buildings. Had petitioners done so, they would have realized that relocation of the buildings would conflict with the purpose of the statute as stated in the committee reports.

Nor does section 1.191-2(e)(6), Income Tax Regs., alter our analysis. As our review of the law in this area reveals, certified historic structures generally have been afforded more favorable treatment than that available to other buildings. In addition, the nature and extent of the tax incentives for the rehabilitation of such structures have varied greatly over time. Moreover, section 191 was repealed under ERTA. With these considerations in mind, we see no merit whatsoever in petitioners' contention that section 1.191-2(e)(6), Income Tax Regs., bears on the resolution of the issue presented.

To reflect the foregoing,

*Decisions will be entered for respondent.*